The executor of the estate of Robert D. Carvill filed his petition representing to the court that the decedent had, within one year prior to his death, transferred, by way of gift, to each of four charitable institutions without the state of Washington, securities of the value of five thousand dollars, the donees being National Board of Young Women's Christian Association of the United States, New York; Tuskegee Normal and Industrial Institute, Tuskagee, Alabama; Ministers and Missionaries Benefit Board of the Northern Baptist Convention, New York; and Northern California Baptist Convention, Los Angeles, California; that the transfer to each institution was evidenced by a contract in which the institution agreed to pay to the decedent an annuity of four hundred and fifty dollars during his lifetime; that the supervisor of the inheritance tax and escheat division of the state of Washington asserted the liability of the estate to pay the statutory inheritance tax of ten per cent upon these transfers; and prayed for a determination by the court of the liability of the estate for inheritance taxes upon the transfers.
Upon the hearing, the court found that the transfers were not made in contemplation of death as defined by the statute, were not intended to take effect in possession or enjoyment after the death of decedent, and were therefore not taxable. From the resulting judgment, this appeal is taken.
Robert D. Carvill died in Seattle, March 7, 1933, *Page 629 
being at the time of his death ninety-three years of age. The transfers here involved were made by him in the preceding year, by delivery of United States government bonds. The contract issued by the National Board of Young Women's Christian Association was as follows:
"WHEREAS, ROBERT D. CARVILL, of Seattle, King County, Washington, has given the sum of Five-Thousand-Dollars to THE NATIONAL BOARD OF THE YOUNG WOMEN'S CHRISTIAN ASSOCIATIONS OF THE UNITED STATES OF AMERICA, a religious, missionary, and educational corporation, organized under the laws of the State of New York, conducted without profit, and having its principal office at 600 Lexington Avenue, New York, New York.
"Now, THEREFORE, said THE NATIONAL BOARD OF THE YOUNG WOMEN'S CHRISTIAN ASSOCIATIONS OF THE UNITED STATES OF AMERICA, in consideration of the said gift, receipt whereof is hereby acknowledged, hereby promises and agrees, for itself and its successors, to pay to said ROBERT D. CARVILL during the term of his natural life the annual sum of Four-Hundred-Fifty ($450) Dollars, to be paid in quarterly installments of One-Hundred-Twelve and 50/100 ($112.50) Dollars each, during the life of said annuitant, commencing on the first day of October, 1932, (if said annuitant is then living) and terminating with the last payment preceding the death of said annuitant; provided, however, that upon his death there shall be paid to his executors, administrators, heirs or devisees, the proportionate amount of the installment next to be due and accruing subsequent to the date of the last installment paid to said annuitant up to the time of his death.
"The said THE NATIONAL BOARD OF THE YOUNG WOMEN'S CHRISTIAN ASSOCIATIONS OF THE UNITED STATES OF AMERICA further agrees, in consideration of said gift, that after the last payment is made hereunder to the said ROBERT D. CARVILL, in accordance with the terms hereof, it will use the income, whatever the same may be, for the support of the general work of THE NATIONAL BOARD OF THE YOUNG WOMEN'S *Page 630 
CHRISTIAN ASSOCIATIONS OF THE UNITED STATES OF AMERICA.
"The acceptance of this agreement makes all its recitals and stipulations binding upon the annuitant, said ROBERT D. CARVILL, and his legal representatives."
The other three contracts were substantially the same in general terms, although varying in some details not material here. Each contract recites that it is executed by the donee in consideration of the gift of five thousand dollars. The agreement issued by the Northern California Baptist Convention, in conformity with the requirements of the statute of that state, bears upon its face this notation:
"The reasonably commensurate value as of the date of this agreement of the benefits thereby created, as defined by Section 594 1/2 of the Political Code of the State of California, pursuant to the table of mortality, and upon the interest assumptions therein stipulated, is $885.70."
The life expectancy of the decedent at the time of making the contracts, according to the mortality tables issued by the insurance department of the state of Washington, was a little more than a year and a half, or, precisely, 1.67 years.
By the testimony of the executor, Mr. Berry, it appears that he had known the decedent for twelve or thirteen years preceding his death. Mr. Berry was vice-president of the First National Bank of Seattle, and the decedent frequently, in the last five years of their acquaintance, called on him for advice and counsel on his financial affairs. He had all to do with the annuity contracts in question. In 1928, the decedent had taken out an annuity contract in the Mutual Life Insurance Company, under which, for a cash payment of five thousand dollars, he was to receive one hundred dollars a month during the rest of his life. He received a great deal of satisfaction from this contract, *Page 631 
because it seemed he was going to get all his money back before his death. He was so impressed with the success of this investment that he spoke to Mr. Berry about taking out additional annuities. From this, Mr. Berry conceived the idea
". . . of having him take these annuity contracts with these charitable institutions, which would give him a good substantial income, it seemed to me. I felt that the money was being placed in better directions than it would be if given to insurance companies."
When questioned as to his statement that the investments in annuity contracts of the charitable institutions was purely a business investment, Mr. Berry said:
"I would not say it was purely and simply a business investment, because I sold him on the idea of putting it in that form of annuity with the charitable institutions, having in mind my own — from my own viewpoint the argument if he did pass away the money would go to the benefit of some charitable organization rather than the balance all going to the benefit of some insurance company."
That the transactions were not business investments, is obvious from the facts and the testimony of Mr. Berry. The five thousand dollars invested with the Mutual Life Insurance Company in 1928, four years before, when his expectancy of life was much longer, produced twelve hundred dollars per annum. A like sum invested in an annuity policy in 1932 would have brought much more than that sum.
It appears that the decedent, while well preserved for his age, was much concerned about his health and frequently called upon Dr. J.A. Benshoof in Seattle, and also, on occasions, visited the Mayo Institute in Rochester, Minnesota. Mr. Berry testified that he spoke of living to be one hundred years old. Of *Page 632 
course, if he had any such thought, an investment of his money in regular insurance annuities would have held out to him the prospect of an extremely profitable investment. He was a careful man in money matters, close, bordering on stingy, although he appears to have made out of his income some relatively small donations to charity. His controlling idea was to preserve his capital intact. Whatever he did in the way of charity, came out of his current income.
At the time the gifts in question were made, his estate was of the value of about eighty thousand dollars. In addition to the four gifts on which taxes are sought, he made other like gifts. They are not involved here, because they are not claimed to be taxable. After his death, the remainder of his estate was appraised at thirty-eight thousand dollars. The bulk of it was left to charity, some of the bequests going to some of the institutions here involved. He was a widower, with no children or other near relatives to provide for.
The inheritance tax and escheat division assigns as error: (1) The failure of the court to hold that the contracts were made in contemplation of death and subject to inheritance tax; and (2) the failure to find that the contracts were intended to take effect in possession or enjoyment after death of the decedent, and, therefore, subject to the tax. Our conclusion on the first assignment will dispose of the case.
[1] Rem. Rev. Stat., § 11201-a [P.C. § 7051-1] provides:
"Any transfer of property made by a decedent by deed, grant, sale or gift within two years prior to said decedent's death, without a valid and adequate consideration therefor, shall be presumed to have been made in contemplation of death."
The statute itself does not define the term "made in contemplation of death." Its meaning is to be determined *Page 633 
by reference to textwriters and adjudicated cases. The term is defined in 26 R.C.L. p. 225, § 195, as follows:
". . . an apprehension of death arising from some existing bodily condition or impending peril and not the general expectation of eventual decease commonly entertained by all persons. The contemplation of death must be the impelling motive, without which the conveyance could not be made . . ."
The respondent quotes the definitions given by numerous courts, perhaps one of the best being from Armstrong v. State exrel. Klaus, 72 Ind. App. 303, 120 N.E. 717:
"The words `in contemplation of death' as used in the inheritance tax statutes, do not refer to that general expectation of death entertained by all persons, but they do refer to that expectation of death which arises from some such bodily or mental conditions, irrespective of the cause in any particular case, which prompts persons to dispose of their property to those they deem entitled to their bounty."
In the solution of the problem before us, we are necessarily dependent upon the testimony of Mr. Berry as it appears in the record, because, as he said himself, he sold the idea of the gifts to the decedent and had all to do with the transactions. That the gifts were not investments, is apparent. In the first place, the contracts all definitely and in explicit terms characterize the transfers to the institutions as gifts. In the second place, considered as annuities, the return to the decedent was wholly disproportionate, in view of the much greater return he would have received from an investment in an ordinary life insurance company. Mr. Berry's own testimony strongly infers that the underlying purpose was to secure to the donees the benefit that would accrue from the probable early demise of a man of decedent's great age. *Page 634 
It is apparent, too, that it was the purpose of the decedent to leave the bulk of his estate to charities, and, being a prudent man, he doubtless saw that he could accomplish two purposes by transferring his government 3 1/2% bonds to the charities to whom his money would ultimately go, and receiving for life an assured return, — a return which, while much less than that paid by an insurance company, would be much larger than what he was receiving upon government bonds. He undoubtedly had in mind, and Mr. Berry's own testimony so implies, that, by the probability of his early demise, the institutions would be greatly benefited, while he would suffer no loss of income as long as he lived. In other words, he was anticipating a testamentary disposition of a portion of his estate.
This disposition of his property and the motives that inspired it are not to be critized; on the contrary, we think they are to be commended. But conceding this, the state can not be deprived of its revenue by the transfer, however commendable its purpose. Our conclusion that the gifts were made in contemplation of death is not based wholly upon the fact of decedent's extreme age; but that fact, coupled with his mental attitude, his intentions as to the ultimate disposition of his estate, and the inference to be drawn from Mr. Berry's testimony, convinces us that the gifts were made in contemplation of death, within the meaning of Rem. Rev. Stat., § 11201-a [P.C. § 7051-1].
The judgment of the trial court is reversed, and the cause remanded with direction to ascertain the taxable value of the gifts as of the date of decedent's death, and that, upon the value so found, the estate be required to pay the statutory tax.
MILLARD, C.J., MAIN, BEALS, and TOLMAN, JJ. concur. *Page 635